# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 5, 2026                Decided July 17, 2026

No. 24-3159

UNITED STATES OF AMERICA,
APPELLANT

v.

AHMED SALIMFARAJ ABUKHATALLAH, ALSO KNOWN AS
AHMED MUKATALLAH, ALSO KNOWN AS AHMED ABU
KHATALLAH, ALSO KNOWN AS AHMED BUKATALLAH, ALSO
KNOWN AS SHEIK,
APPELLEE

---

Consolidated with 24-3160

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cr-00141-1)

---

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellant/cross-appellee. With him on the briefs were *Jeanine Ferris Pirro*, U.S. Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *John Crabb, Jr.*, Assistant U.S. Attorneys.

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellee/cross-appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Tony Axam, Jr.*, Assistant Federal Public Defender, entered an appearance.

Before: HENDERSON, CHILDS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Ahmed Abu Khatallah (Khatallah) helped lead the 2012 terrorist attack on the U.S. Special Mission in Benghazi. Four years ago, we vacated the twenty-two-year sentence he received for his role in that attack, finding it "shockingly" light. On remand, the district court imposed a slightly higher sentence of twenty-eight years. The government has again appealed, arguing that Khatallah's sentence is unreasonably lenient. Khatallah has cross-appealed, contending that the district court procedurally erred in imposing a higher sentence. Agreeing with the government, we vacate the district court's sentence and again remand for resentencing.

## I. Background

### A

In 2011, the United States established a diplomatic outpost in Benghazi, Libya, known as the Special Mission. *See* Accountability Rev. Bd., *Unclassified Report* 2 (2012), https://20092017.state.gov/documents/organization/202446.pdf [https://perma.cc/XMW4-HDTV]. The outpost was intended to promote the country's orderly transition from the Gaddafi regime to democracy. *Id.* About one mile away sat another compound, the "Annex," which was staffed by the U.S. Central Intelligence Agency. App. 380–82.

On September 11, 2012, at approximately 9:45 p.m., a group of twenty or more terrorists attacked the Mission. The terrorists, armed with assault rifles and rocket-propelled grenades, burned vehicles and buildings at the Mission and later attacked the Annex by mortar. *See* Accountability Rev. Bd., *supra*, at 27. They killed four Americans: Ambassador Chris Stevens and IT specialist Sean Smith, both of whom died in the Mission fire, and Glen Doherty and Tyrone Woods, who died in the attack on the Annex. The Americans who survived the attack fled to the Benghazi airport, where they were flown to safety.

Khatallah was "the commander and the religious authority" of a militia known as Ubaydah Bin Jarrah (UBJ). App. 657; *accord* App. 903. UBJ fought in the revolution against Gaddafi. UBJ also was one of the militant groups that attacked the Mission.

Khatallah's role began, at a minimum, several days before the attack. During that period, Khatallah drove with his men to the camp of an armed security force. At the camp, Khatallah spoke with the force's leader while his men loaded UBJ vehicles with weapons and ammunition, including, according to one witness, mortars and mortar shells. Khatallah departed the camp with four truckloads of weapons.

Khatallah also helped execute the attack. On the night of the attack, Khatallah drove his men to the Mission. Minutes after the attack began, UBJ terrorists were inside the Mission. These included two men, Dijawi and Jutuf, who had helped Khatallah load weapons at the camp, as well as a man carrying a UBJ flag. Khatallah spoke regularly with Dijawi, Jutuf and other attackers by phone before, during and after the attack. Additionally, Khatallah placed a call to a leader of a Libyan

security force about forty minutes into the attack, instructing him to withdraw the men assigned to protect the Mission.

Around midnight, Khatallah entered the Mission. Surveillance footage depicts Khatallah entering a building at the Mission, armed with an AK-47 and issuing instructions to other attackers. He also assisted with the getaway. After the attack, Khatallah drove his men from the Mission and to the camp of another militant group. He later bemoaned that the terrorists had been unable to "kill everybody" at the Mission, "even those who [had escaped to] the airport." App. 995; *accord* App. 236.

The attack at the Annex began around midnight. For one hour, the terrorists attacked the Annex with rifles and rocket-propelled grenades. Then, around 5:00 a.m., they attacked the Annex by mortar. Three mortar shells struck the roof of a warehouse, killing Woods and Doherty, who, still waiting to be rescued, had been returning fire from the rooftop.

Identifying Khatallah as a likely participant in the attack, U.S. authorities arrested him in Benghazi in 2014. *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 39 (D.D.C. 2017). A grand jury returned an eighteen-count indictment and the parties proceeded to trial.

**B**

Following a seven-week trial, the jury returned a guilty verdict on four counts: conspiracy to provide material support for terrorism, in violation of 18 U.S.C. § 2339A (Count One); providing material support to terrorism, in violation of 18 U.S.C. § 2339A (Count Two); maliciously destroying and injuring property within the U.S. special maritime and territorial jurisdiction, in violation of 18 U.S.C. § 1363 (Count

Sixteen); and using or carrying a semiautomatic assault weapon during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Eighteen). The jury acquitted Khatallah of the remaining fourteen counts, which included the murder and attempted murder of the Americans killed or injured in the attack on the Mission, as well as all charges stemming from the attack on the Annex. The jury also returned a special finding that the conspiracy and material support charges of Counts One and Two, respectively, did not result in death. The "best explanation of the verdicts," we later explained, is that the jury believed "Khatallah was vicariously responsible for the first wave of the attack on the Mission where American lives were in danger but was not responsible for either the deaths that resulted from the first wave or the subsequent attack on the Annex." *United States v. Khatallah* (*Khatallah I*), 41 F.4th 608, 629–30 (D.C. Cir. 2022) (per curiam).

The district court adopted the U.S. Sentencing Guidelines (Guidelines) range recommended by the probation office. The court grouped Counts One, Two and Sixteen to reflect that they implicated the same victim and were part of a common course of conduct. *See* U.S.S.G. § 3D1.2(b). The base offense level for those counts was twenty-four. The court also found— notwithstanding the jury's special finding—that Khatallah's relevant conduct had resulted in death. "[I]t is more likely than not," the court explained, that Khatallah had "agreed with several other participants to launch an armed attack on the Mission, and the attack foreseeably resulted in deaths that furthered the ends of the conspiracy." App. 262. Accordingly, the court cross-referenced the Guideline for the most analogous offense—second-degree murder, U.S.S.G. § 2A1.2—and thereby increased the offense level for the grouped counts to thirty-eight. *See* U.S.S.G. § 2K1.4(c).

The court then applied two enhancements. The first was the terrorism enhancement. *See* U.S.S.G. § 3A1.4(a). The court found that Khatallah had committed a qualifying crime of terrorism and had committed it to retaliate against the U.S. government for its presence in Libya. "[T]he very choice of target for the attack," the court observed, "suggests that it was" directed at the United States. App. 276. This enhancement added twelve offense levels and moved Khatallah, who lacks any known past convictions, into Criminal History Category VI—the highest category.

The court also applied an enhancement for Khatallah's aggravating role as an organizer or leader of the conspiracy. *See* U.S.S.G. § 3B1.1(a). It noted that Khatallah led UBJ, one of the militant groups that had attacked the Mission, and that Khatallah had directed his men during and after the attack. This enhancement added four offense levels.

Collectively, the cross-reference and enhancements produced a Guidelines range of life for the grouped counts. Those counts carry, however, statutory maxima well below life. Counts One and Two are capped at fifteen years, 18 U.S.C. § 2339A(a); Count Sixteen, at twenty, *id.* § 1363. Count Eighteen carries a minimum consecutive sentence of ten years' imprisonment and a statutory maximum of life imprisonment. *Id.* § 924(c)(1)(B)(i).

The government requested a sentence of life plus fifty years—*i.e.*, the statutory maximum sentence for all counts. Khatallah requested a sentence of between fifty-one and sixty-three months on the grouped counts, with Count Eighteen's minimum ten-year sentence to follow consecutively.

At Khatallah's sentencing hearing, the court began with the Guidelines. It then considered the 18 U.S.C. § 3553(a)

sentencing factors. It first noted that Khatallah's offenses were "gravely serious." App. 1184. Khatallah helped lead the attack on the Mission. He drove his men to the Mission; directed them before, during and after the attack; entered the Mission himself, armed with an assault rifle; and ferried his men to another militant camp afterwards. Even if he did not "light the match" that killed the two Americans, the court reasoned, Khatallah helped lead the attack and "once those gates were breached the likelihood of someone dying was extremely high." App. 1184–85.

Khatallah's personal characteristics were, in the court's view, a mixed bag. Khatallah seemed like a "creature" of his violent "culture," the court opined, and also a hard-working man with a supportive family. App. 1185–86. At the same time, the court believed that Khatallah "might readily resort to or order violence in furtherance of whatever ideological or political goals [he] might have." App. 1185.

The court then considered deterrence. In its view, "general[]" deterrence was critical. App. 1186. The United States has facilities and outposts all over the world, the court noted, and would-be attackers need to know that they will receive "stiff sentences" if convicted. App. 1186. "Specific[]" deterrence was less clear-cut. App. 1186. Khatallah would be significantly older when released, the court reasoned, but could, upon returning to Libya, rely on his network to harm Americans again.

The court then turned to what it considered the most important factor—the jury verdict. The jury had acquitted Khatallah of the most serious charges and had convicted him of what the court described as "essentially a property crime." App. 1190. The court thus determined that a life sentence would "overestimate[]" Khatallah's crimes and culpability, as

the jury had viewed them. App. 1190–91. Accordingly, the court varied downward and imposed a sentence of 144 months on the grouped counts, with Count Eighteen's minimum ten-year sentence to run consecutively. Both parties appealed.

## C

We rejected Khatallah's appeal in its entirety. *Khatallah I*, 41 F.4th at 624–43. As to the government's cross-appeal, however, we held that the district court's sentence was unreasonably lenient and vacated it. *Id.* at 643. In our view, neither the district court's acquitted-conduct rationale nor its analysis of the section 3553(a) factors justified the substantial downward variance it chose. *Id.* Based on the government's uncontested calculation, we assumed that, discounting acquitted conduct, Khatallah warranted a Guidelines range of thirty years to life on the grouped counts, plus a consecutive ten years for the section 924(c) count. *Id.* at 647–48. But the district court had imposed a sentence of "just twelve years" on the grouped counts. *Id.* at 643. Without some explanation for why the acquitted-conduct rationale could justify subtracting an additional eighteen years, that rationale could not, we determined, bear the weight that the district court had placed upon it. *Id.* at 647.

Nor could the district court's section 3553(a) analysis carry the load. The seriousness of Khatallah's offenses did not support the variance. *Khatallah I*, 41 F.4th at 649. The district court had, we noted, described Khatallah's offense as "essentially a property crime." *Id.* But we found that description "inconsistent with the district court's own findings . . . and failed to account for the two support-of-terrorism convictions." *Id.* Khatallah's personal history and characteristics could not justify the variance either. *Id.* at 650. And deterrence interests weighed in favor of a steep sentence,

not a lenient one. *Id.* In sum, we found that the district court's sentence was "shockingly low and unsupportable as a matter of law" on the existing record. *Id.* at 649 (citation modified). We thus vacated the sentence and remanded for resentencing. *Id.* at 651.

**D**

On remand, the district court started with the Guidelines. It readopted its findings from the first sentencing hearing, which had triggered a Guidelines range of life for the grouped counts and of ten years for Count Eighteen. "[T]hat same range," the court determined, "applies here." App. 1242.

The court then adjusted that range downward to discount conduct of which Khatallah was acquitted. It noted that it was bound by how we had treated the acquitted conduct in *Khatallah I*, which entailed "a guidelines range of 30 to life without acquitted conduct on Counts 1, 2, and 16, [and] a guideline range of 10 years on Count 18, for a total of 40 years to life." App. 1246. The court thus recognized that it needed to justify any variance below forty years. It offered four justifications.

First, the court devised a "sentenc[ing] packag[e]" that, it thought, promoted the general aims of sentencing. App. 1246. Under the sentencing-package framework, a sentencing court "craft[s] a disposition in which the sentences on the various counts form part of an overall plan." *United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) (citation modified). Courts can use the framework where, as here, section 924(c) offenses and underlying predicate offenses combine to produce recommended sentences that they find too high. *E.g.*, *Dean v. United States*, 581 U.S. 62, 69–70 (2017). The district court found that imposing the full forty-year term

for Khatallah's section 924(c) offense (Count Eighteen) and predicate offense (Count Sixteen) would overstate the seriousness of Khatallah's offenses, especially considering that he did not harm anyone. Moreover, the court reasoned, the "unique context" of Khatallah's section 924(c) offense—namely, the civil war in Libya and the multitude of weapons it involved—diminished the need to deter similar conduct. App. 1247. Additionally, a forty-year sentence was not necessary to protect the public from Khatallah, the court thought, because it would have imprisoned him until he was in his eighties—an "actuarial life sentence." App. 1247.

Second, the court declined to impose consecutive sentences on the grouped counts. It acknowledged that the Guidelines directed it to run sentences consecutively as necessary to impose a sentence within the Guidelines range. *See* U.S.S.G. § 5G1.2(d). But the court purported to identify an exception to that directive if multiple counts "describe essentially the same conduct"—as, in its view, was applicable to the grouped counts. App. 1248.

Third, the court found that Khatallah did not warrant the entire terrorism enhancement. The court thought that Khatallah's conduct lacked many of the "hallmarks" of terrorism the Congress had in mind when it directed the U.S. Sentencing Commission (Commission) to create that enhancement. App. 1249. Most notably, Khatallah's conduct—as the jury saw things—did not harm anyone.

Fourth, the court imposed a "modest variance" because Khatallah was a deportable alien, a status that rendered him ineligible for early release to community confinement. App. 1249. The court concluded by repeating that the "main reason for the variance" was "respect for our jury system." App. 1251. It thus imposed another downward variance, sentencing

Khatallah to twenty-eight years in prison. From the district court's judgment, the government appealed and Khatallah cross-appealed. We again have jurisdiction under 28 U.S.C. § 1291.

## II. Analysis

We review the reasonableness of a criminal sentence "in two steps." *United States v. Turner*, 21 F.4th 862, 864 (D.C. Cir. 2022) (citation modified). First, we decide whether the district court committed "significant procedural error." *Id.* (citation modified). That error can include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). Second, we decide whether the district court abused its discretion by imposing a sentence that is substantively unreasonable, *Turner*, 21 F.4th at 864—that is, one that is higher or lower than the general aims of sentencing in 18 U.S.C. § 3553(a) can reasonably support, *see United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

Under section 3553(a), a sentencing court must impose a sentence that is "sufficient, but not greater than necessary," to promote the goals of sentencing. 18 U.S.C. § 3553(a). Those goals intend each sentence

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

If the sentencing court determines "that an outside-Guidelines sentence is warranted," it must "ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "[A] greater justification is required when district courts select an above- or below-Guidelines sentence, over a within-Guidelines sentence." *United States v. Parks*, 995 F.3d 241, 248 (D.C. Cir. 2021). We nevertheless give "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. And for that reason, "[i]t will be the unusual case when an appeals court can plausibly say that a sentence is so unreasonably high or low as to constitute an abuse of discretion." *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016) (citation modified).

**A**

Khatallah's cross-appeal sounds in procedural error and we consider it first. *See United States v. Brown*, 808 F.3d 865, 870 (D.C. Cir. 2015). Khatallah challenges the district court's decision to impose a higher sentence on remand. He highlights the court's statement at the resentencing hearing that it "still believe[d]" a twenty-two-year sentence was "appropriate," Khatallah Br. 59–60 (quoting App. 1244–45), and thus contends that the court procedurally erred when it imposed a

twenty-eight-year sentence while expressly believing that a twenty-two-year sentence was sufficient.

As noted, a sentencing court must comply with established procedures. *See In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008). We normally review unpreserved procedural-error claims for plain error. *United States v. Pyles*, 862 F.3d 82, 86–88 (D.C. Cir. 2017). That scope of review applies because Khatallah did not present this argument to the district court. Accordingly, we will vacate the district court's sentence on the basis of Khatallah's argument only if he can show the existence of a plain error that affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732–34 (1993).

The asserted error was not plain. The district court started with an uncontested Guidelines range. It observed that it had to impose a higher sentence than the twenty-two-year sentence that we vacated in *Khatallah I*. And it articulated some of the section 3553(a) factors and explained why those factors supported its new sentence. None of this was plainly unreasonable and Khatallah does not argue otherwise.

Khatallah contends that the district court abused its discretion by imposing a higher sentence while continuing to believe that its original sentence was adequate. But the district court had a satisfactory reason for imposing a higher sentence: we had vacated its original sentence as substantively unreasonable. That mandate reflected our judgment that the sentence was "shockingly low." *Khatallah I*, 41 F.4th at 649 (citation modified). The district court did not plainly err when it imposed a higher sentence to meet our mandate.[1] And

---

[1] Khatallah disclaims any argument that the district court failed to explain why it chose a six-year increase—as opposed to, for example, a two-year or four-year increase. Khatallah Reply Br. 1

because the asserted error was not plain, we reject Khatallah's procedural-error argument and turn to the government's appeal.

**B**

The government contends that Khatallah's sentence remains too lenient and, hence, is substantively unreasonable. Before we address the merits of that argument, however, we briefly address a threshold issue. Ever since the district court adopted the probation office's Guidelines calculations in June 2018, the parties, district court and earlier panel all have understood Khatallah's Guidelines range on the grouped counts to be life imprisonment. On remand, the district court discounted acquitted conduct and applied a range of forty years to life for the counts of conviction—without objection and consistent with our earlier opinion. *Khatallah I*, 41 F.4th at 648. Khatallah now challenges the Guidelines range for the first time. He asserts that his Guidelines range was capped at the statutory maxima for Counts One, Two and Sixteen—fifty years—with Count Eighteen's ten-year minimum sentence to follow consecutively. In short, he contends that his Guidelines range for all counts is forty-to-sixty years, not forty years to life.

Because Khatallah did not object to the district court's calculation of the Guidelines range, we review this claim for plain error. Fed. R. Crim. P. 52(b). Under the plain-error standard, Khatallah must establish the existence of an error that is "so obvious that [a] judge should have recognized [the error] even though counsel failed to point it out." *United States v.*

("Mr. Khatallah's cross-appeal is not about the adequacy of explanation for the specific amount of time the court added to his original 22-year sentence.").

*Arrington*, 160 F.4th 206, 208 (D.C. Cir. 2025). He must also show that any error affected his substantial rights. *Olano*, 507 U.S. at 732–35.

Khatallah cites only one authority to support his argument—the Guideline that addresses the imposition of a sentence involving multiple counts of conviction. *See* U.S.S.G. § 5G1.2. Specifically, Khatallah homes in on Application Note 1, which states, as relevant, "the defendant's guideline range . . . may be affected or restricted by a statutorily authorized maximum sentence . . . [even] in a multiple-count case." Khatallah Br. 33 n.9 (quoting U.S.S.G. § 5G1.2 cmt. n.1). We are not persuaded. Even assuming that Application Note 1 constitutes a binding legal norm that can establish plain error, *United States v. Otunyo*, 63 F.4th 948, 959 (D.C. Cir. 2023), it does not establish plain error here. Whatever Application Note 1 might accomplish, it does not "clearly" cap a defendant's Guidelines range at the statutory maxima associated with only a subset of the counts of conviction—as opposed to the maxima associated with all of those counts, the maximum here being life plus fifty years. The asserted error, then, is not plain. Thus, we apply the same Guidelines range that we applied in *Khatallah I*, assessing the district court's variance against a Guidelines range of forty years to life. 41 F.4th at 648.

The district court offered four reasons to support its sentence but those reasons cannot bear the weight it assigned to them. We therefore vacate Khatallah's sentence and again remand for resentencing.

**1**

The district court first invoked the sentencing-package doctrine. As explained above, courts can use this doctrine

when imposing a sentence based on interdependent offenses, including an offense with a mandatory-minimum sentence and a predicate offense without one. In those circumstances, the court might determine that the Guidelines range for the predicate offense would, if added to the mandatory sentence, overstate the gravity of the defendant's conduct. It could then exercise its discretion to vary downward when imposing a sentence for the predicate offense.

That is what the district court did here. Finding Khatallah's forty-year-to-life Guidelines range for his section 924(c) offense and predicate offense unnecessarily severe, the district court varied downward and imposed a shorter sentence for the predicate offense. That approach was not improper. But, as the district court seemingly recognized, the sentencing-package doctrine does not suspend its obligation to fashion a sentence that is sufficient to promote the general aims of sentencing. 18 U.S.C. § 3553(a); *see Dean*, 581 U.S. at 67–68. Although it offered three reasons that, in its view, its sentencing package adequately promoted those general aims, each reason is unpersuasive.

First, the district court believed that a forty-year sentence would overstate the seriousness of Khatallah's conduct, as determined by the jury. Most notably, the district court emphasized, Khatallah was not responsible for "kill[ing] or injur[ing]" anyone. App. 1247.

A twenty-eight-year sentence does not reflect the seriousness of Khatallah's crimes. Khatallah helped prepare for and execute a premeditated, armed attack on a U.S. diplomatic outpost. He pressured a Libyan security force not to patrol the Mission during the attack. And his only stated regret was that the terrorists did not kill every American at the Mission. Although Khatallah did not realize that goal, his

failure to inflict harm—whether due to fortuity or incompetence—does not dilute the "gravely serious" nature of his crimes.[2] App. 1184. As we explained in *Khatallah I*, the facts of this case cannot support a "significantly below-Guidelines sentence." 41 F.4th at 649. Indeed, given these facts, it is difficult to see how Khatallah is not one of the "more culpable, more dangerous" offenders within his Guidelines range. *United States v. Stewart*, 590 F.3d 93, 144 (2d Cir. 2009). The seriousness of Khatallah's conduct does not support a downward variance.[3]

Second, the district court thought that the "additional ten-year sentence" for Khatallah's section 924(c) offense was not necessary to deter similar conduct. App. 1247. That was so, the court reasoned, because of the "unique context" of the section 924(c) offense—the Libyan civil war. App. 1247. But Khatallah was not convicted of happenstance arms possession in Libya. He was convicted of leading the terrorist attack on the U.S. Special Mission, armed with an AK-47 and the intent that the terrorists kill as many Americans as possible. The "unique context" of the offense was, if anything, a U.S.

---

[2] Underscoring this point, Khatallah's forty-year-to-life Guidelines range was established entirely by offenses and enhancements that do not necessarily contemplate harm to anyone. *See* App. 253–55; 18 U.S.C. § 924(c); *id.* § 1363; *infra* Section II.B.3.

[3] We could also read the district court's statements as incorporating the acquitted-conduct rationale. That alternative reading would not change our conclusion. The acquitted-conduct rationale was used to support the district court's decision to apply a Guidelines range of forty years to life. Relying on the same rationale, without explaining why that rationale could justify a variance from the bottom of the Guidelines range, would simply repeat the error that we corrected in *Khatallah I*. 41 F.4th at 649.

diplomatic outpost surrounded by simmering regional violence. In that setting, the need to deter the use of assault weapons during crimes of violence is enhanced, not reduced. As the district court recognized, "anyone intent" on attacking a U.S. diplomatic outpost or its staff must know that he will receive a "stiff sentence[]" if apprehended. App. 1186. The court's sentence failed to promote that goal.

Finally, the district court believed that a virtual life sentence was unnecessary to protect the public from Khatallah. Khatallah was roughly forty years old when he helped lead the assault on the Mission and forty-five when he stood trial and was sentenced. Setting aside any sentence reductions, then, a Guidelines sentence would imprison Khatallah until he is almost ninety.

Still, we believe the district court's sentence was not adequate to protect the public. Even if older defendants are less likely to recidivate—and thus less in need of deterrence or incapacitation—as a general matter, the more relevant question is whether that is true of Khatallah "in particular." *United States v. Wurzinger*, 467 F.3d 649, 653 (7th Cir. 2006); *accord United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017). The district court's own findings suggest that it is not. After opining that Khatallah is a creature of his environment and is unlikely to recidivate, the district court nonetheless concluded that Khatallah might resort to violence to achieve his political or religious goals and could, upon release, reconnect with his contacts in Libya to do so. These offsetting conclusions do not suggest that there is a diminished need to protect the public from Khatallah, regardless of his age. Accordingly, and as has already been explained, they do not support a downward variance. *Khatallah I*, 41 F.4th at 650.

Further, the district court failed to tailor its rationale to Khatallah's specific offenses. *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011). Khatallah helped hatch a sophisticated plan to attack a U.S. diplomatic outpost. To execute that plan, he coordinated a network of contacts ranging from his own militia to a Libyan security force assigned to protect the Mission. These are not crimes of youthful passion. Nor are they crimes that a devout religious militant would be unable to direct in old age. And "[p]erhaps most importantly," Khatallah has never "disavowed terrorism." *United States v. Ramic*, 175 F.4th 761, 772 (6th Cir. 2026). Given these facts, the district court abused its discretion when it determined that a twenty-eight-year sentence was adequate to protect the public from Khatallah. On the whole, then, the 3553(a) factors do not support the sentence that the court imposed.

**2**

The district court also found it improper to impose consecutive sentences under U.S.S.G. § 5G1.2(d). As explained above, section 5G1.2(d) instructs sentencing courts to impose consecutive sentences when necessary to impose a sentence within the Guidelines range. The court believed that applying section 5G1.2(d) was unwarranted here because the grouped counts stemmed from what was, in essence, the same course of conduct. The court's decision effectively capped Khatallah's sentence for the grouped counts at twenty years, given that the highest statutory maximum for any grouped count was Count Sixteen's maximum of twenty years.

We can assume that the district court's same-conduct rationale could, in an appropriate case, justify ignoring section 5G1.2(d). We can also assume it could justify ignoring section 5G1.2(d) even where, as here, the court has grouped the counts

in question[4]—such that two of the three counts did not contribute to Khatallah's offense level and were not necessary to support the enhancements imposed.[5] Even so, the court's rationale cannot support the sentence it chose.

The reason is this: Sentencing courts ultimately must decide whether to impose concurrent or consecutive sentences in a manner that is consistent with their application of section 3553(a). 18 U.S.C. § 3584(b); *accord United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). And as we explained above, the district court's twenty-eight-year sentence failed to reflect section 3553(a)'s general aims. That sentence significantly understates the seriousness of Khatallah's offenses and fails to adequately promote deterrence or protect the public from Khatallah. The district court's purported "exception" to section 5G1.2(d), App. 1248, cannot alter that conclusion because it cannot transform what is otherwise a substantively unreasonable sentence into a permissible exercise of discretion. The fact that Khatallah's offenses stemmed from the same course of conduct is, in the appropriate circumstances, one factor the court may consider in fashioning an appropriate sentence. But it does not support the court's decision to impose fully concurrent sentences for the grouped

---

[4] Because section 5G1.2 expressly exempts counts like Count Eighteen from its procedures, *see* U.S.S.G. § 5G1.2(a) & cmt. n.2(A), only the grouped counts are relevant to the issue of sentence stacking under section 5G1.2(d).

[5] Courts have applied section 5G1.2(d) to grouped counts—*i.e.*, counts that, as relevant, arise from the same act or transaction, U.S.S.G. § 3D1.2(a). *See United States v. Garcia-Torres*, 341 F.3d 61, 75–76 (1st Cir. 2003) (collecting cases); *see also United States v. Maldonado-Passage*, 56 F.4th 830, 838 (10th Cir. 2022) (similar).

counts. Hence, it cannot justify the twenty-eight-year sentence.[6]

**3**

The district court further believed that Khatallah did not warrant the full terrorism enhancement, U.S.S.G. § 3A1.4. The enhancement accounts for much of Khatallah's Guidelines range; Khatallah argues, and the government does not dispute, that his Guidelines range would have been seventy-eight to ninety-seven months for the grouped counts without the terrorism enhancement. In the district court's view, Khatallah did not warrant the full enhancement because his conduct "lack[ed] many of the hallmarks of the types of terrorism offenses that Congress was concerned about when it enacted the enhancement as part of the guidelines." App. 1249. "Most importantly," the court reasoned, "no one was harmed based on [Khatallah's] conduct [as] found by the jury." App. 1249.

The Sentencing Commission promulgated the terrorism enhancement in response to an express congressional directive. *See generally United States v. Hasson*, 26 F.4th 610, 621–22 (4th Cir. 2022) (describing the history of the terrorism

---

[6] The Second Circuit concluded that a same-conduct rationale could justify departing from section 5G1.2(d). *United States v. Rahman*, 189 F.3d 88, 157–58 (2d Cir. 1999) (per curiam). That does not change our conclusion. Sentencing courts retain discretion, if justified, not to follow section 5G1.2(d). *See United States v. Brown*, 892 F.3d 385, 398–99 (D.C. Cir. 2018). But they must impose a sentence that reasonably reflects the aims of sentencing all the same. *Id.*; *see United States v. Ceasar*, 10 F.4th 66, 82–83 (2d Cir. 2021) (finding a sentence unreasonably lenient—even though the district court relied on a ground for departure that the Second Circuit had adopted before *Booker*—because "variances must still be reasonable").

enhancement). In 1994, the Congress directed the Sentencing Commission to "provide an appropriate enhancement" for felonies involving or intending to promote "international terrorism." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022. The Congress revisited that instruction soon after. In 1996, it directed the Commission to tie the enhancement to the definition of "federal crimes of terrorism" that the Congress contemporaneously enacted, 18 U.S.C. § 2332b(g)(5). Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303. The enhancement now cross-references the statutory definition. *See* U.S.S.G. § 3A1.4 cmt. n.1.

The statutory definition is telling. It encompasses many crimes that do not require what the district court apparently envisioned—*i.e.*, realized harm to a person. Examples include exceeding authorized computer access, 18 U.S.C. § 1030(a)(1); willfully destroying property manufactured for the United States, *id.* § 1361; and willfully destroying a U.S.-owned telephone pole, *id.* § 1362. *See id.* § 2332b(g)(5). So long as each offense is calculated to intimidate, coerce or retaliate against the government, it falls within the statutory definition. *Id.* § 2332b(g)(5)(A). The definition also encompasses inchoate offenses, including attempting to kill a U.S. officer, *id.* § 1114, or conspiring to damage an energy facility, *id.* § 1366(a), as to which the intended harm is never realized. *See id.* § 2332b(g)(5).

The district court was wrong to conclude that the Congress predominantly was concerned with completed offenses that cause harm to another. It also was wrong to conclude that a defendant failing to harm another does not deserve the full enhancement for that reason alone. *See United States v. Mumuni*, 946 F.3d 97, 112–13 (2d Cir. 2019); *United States v.*

*Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008). And, "[b]y fixating on its own unduly narrow conception of terrorism, the district court ignored its obligation to craft a sentence that reflects Congress's" and the Commission's "broader view" of the offense. *Ramic*, 175 F.4th at 770.[7]

Granted, the terrorism enhancement is advisory. And the district court properly considered whether Khatallah warranted the full enhancement. But its conclusion was erroneous. Khatallah helped lead an armed attack on a U.S. diplomatic outpost with the professed goal of killing Americans. That was a quintessential act of terrorism. The court's rationale, standing alone or in combination with the other factors it considered, does not support the variance it imposed.

**4**

Finally, the district court determined that a "modest" departure was warranted because Khatallah faces more severe punishment as a deportable noncitizen. App. 1249. That punishment likely will include ineligibility for benefits, including home confinement, that are available to other defendants during the final months of their prison terms. *See* 18 U.S.C. § 3624(c). Under our decision in *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), a sentencing court may grant a downward departure on that basis, *id.* at 650, and a six-month departure is not uncommon, *e.g.*, *Otunyo*, 63 F.4th at 954; *United States v. Rodriguez*, 676 F.3d 183, 187, 192 (D.C. Cir. 2012).

---

[7] Indeed, when pressed at argument, Khatallah's counsel did not defend the district court's analysis. She instead contended that even if the district court committed legal error, it still landed in the right place. We disagree. As explained above, the facts and circumstances of Khatallah's offense weigh decisively in favor of a sentence substantially longer than twenty-eight years.

Khatallah acknowledges that *Smith* cannot justify the full variance. We agree. Neither Khatallah nor the district court has identified any reason that *Smith* could justify more than a six-month departure here. Because the balance of the court's analysis does not justify the variance that it imposed, *Smith* cannot save the sentence.

* * *

The sentencing court's discretion is vast. *Gardellini*, 545 F.3d at 1093–94. Given that discretion, we do not mandate that the district court impose a specific sentence on remand. But we will underscore considerations to which the district court is to give greater weight when resentencing Khatallah.

The first is the seriousness of Khatallah's offenses. Khatallah led a conspiracy bent on attacking and destroying the Mission. Shortly before the attack, Khatallah helped UBJ stockpile weapons and ammunition. This "advance procurement of weapons," the district court found, "suggests both that Abu Khatallah understood the nature of the planned attack and that he participated well before he arrived on the scene on the night of the attack." App. 264. On that night, Khatallah drove his men to the Mission. He spoke with terrorists at the Mission before, during and after the attack. And he communicated with the leader of a Libyan security force, instructing him in a threatening tone to withdraw the men assigned to protect the Mission that night.

Khatallah himself entered a building at the Mission, armed with an assault rifle and issuing instructions to other attackers. He later expressed regret, the district court found, that the terrorists had been unable to kill everyone at the Special

Mission—even those who managed to escape to the airport.[8] By any metric, these factual findings reflect offenses that are "gravely serious." App. 1184. And a twenty-eight-year sentence fails to reflect their seriousness.

The second is deterrence. In *Khatallah I*, we determined that deterrence considerations weighed in favor of a steeper sentence, rather than a downward variance, on the grouped counts. 41 F.4th at 650. We explained that "those contemplating attacks on the United States, its official properties, and (most importantly) its personnel must know they will face severe consequences if apprehended and convicted. Their leaders even more so." *Id.* On remand, however, the district court did not mention the need to deter others from engaging in terrorism and thus did not give deterrence considerations the weight they are due. The district court should, on remand, fashion a sentence that more adequately reflects these considerations.

Finally, we reiterate that Khatallah's conduct was not "essentially a property crime." App. 1244–45; *accord* App. 1190. In *Khatallah I*, we instructed the district court not to characterize Khatallah's offenses in that way. 41 F.4th at 649. On remand, the district court clarified that it was not describing its *own* view of Khatallah's offenses—it was instead describing how, in its view, the jury perceived them. Regardless of attribution, that statement does not accurately capture Khatallah's conduct as found by the jury—something we explained in *Khatallah I* and repeat again today. "[T]o

---

[8] None of these facts is inconsistent with the jury's verdict. As we explained in *Khatallah I*, the "best explanation" of the verdicts is that Khatallah was intimately involved in the attack on the Mission but that there was no proof beyond a reasonable doubt that he or his co-conspirators, as opposed to other attackers at the Mission, set the fires that killed the Americans. 41 F.4th at 630.

characterize a terrorist attack on a diplomatic outpost as 'essentially a property crime' . . . [is] inconsistent with the district court's own findings . . . and fail[s] to account for the two support-of-terrorism convictions." 41 F.4th at 649.[9]

For the foregoing reasons, Khatallah's sentence is vacated and the case is remanded for proceedings consistent with this opinion.

*So ordered.*

---

[9] *See also Khatallah I*, 41 F.4th at 625 ("[V]iolations of Section 1363" that place life in jeopardy "are not just property crimes.").